IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |  |
|---|---|---|
| AMANDA W., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21cv663 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Amanda W. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 18.

Presently before the Court are the parties' cross motions for summary judgment, ECF Nos. 20, 22. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 20, be **DENIED**, the Commissioner's Motion for Summary

Judgment, ECF No. 22, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for DIB on November 24, 2020, alleging disability due to post-traumatic stress disorder, anxiety, major depression, attention deficit disorder, and bipolar disorder. R. at 73.[1] Plaintiff's application was initially denied on December 29, 2020, and again denied upon reconsideration on February 12, 2021. R. at 72, 79. On April 1, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 108, 151.

A hearing was held on July 14, 2021, at which Plaintiff appeared with counsel before Administrative Law Judge William Pflugrath ("the ALJ"). R. at 31–65. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 37–58. On August 10, 2021, the ALJ issued a decision finding Plaintiff not disabled. R. at 15–27. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on October 22, 2021, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted her administrative remedies, on December 20, 2021, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On July 1, 2022, Plaintiff filed a motion for summary judgment and accompanying memorandum in support.[2] ECF Nos. 20–21. On August 1, 2022, the Commissioner filed a motion for summary judgment and brief in support. ECF Nos. 22–23. Plaintiff filed a reply on August 9, 2022. ECF No. 24. Because the motions are fully briefed, the matter is now ripe for recommended disposition.

---

[1] "R." refers to the certified administrative record that was filed under seal on May 19, 2022. ECF No. 17, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

[2] Plaintiff's memorandum is support of her summary judgment motion, ECF No. 21, was thirty-five pages—five pages over the maximum permitted under Eastern District of Virginia Local Civil Rule 7(F)(3) absent leave of Court, which Plaintiff did not obtain. ECF No. 25. Nonetheless, the Court considered Plaintiff's memorandum in its entirety.

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was twenty-six years old at the time of her alleged disability onset date of April 13, 2017.  R. at 73.  Plaintiff lives in a two-story home with her husband and three children.  R. at 39.  Plaintiff completed some college and previously worked in Security Services in the United States Air Force.  R. at 41–42.  She received a medical discharge after experiencing postpartum depression.  R. at 43.

### A. Plaintiff's Records Relevant to Her Alleged Physical and Mental Impairments

Plaintiff began treatment with Dr. Antonio Cusi at the Tricare Prime Clinic on September 18, 2017, for medication management, OCD symptoms, mood swings, sadness, irritability, anger, anxiety, and panic attacks.  R. at 238.  Dr. Cusi noted that Plaintiff was previously diagnosed with obsessive compulsive disorder and bipolar disorder.  R. at 238.  Plaintiff reported that she was struggling with depression and anxiety on a daily basis.  R. at 238.  Upon examination, Plaintiff had fair insight and judgment.  R. at 240.  Dr. Cusi prescribed Equetro, Wellbutrin, and Ambien, and instructed Plaintiff to follow up in four weeks.  R. at 241.  In the following weeks, Plaintiff followed up with Dr. Cusi and her mood was stable, but she was still experiencing some anxiety.  R. at 236, 234.  Upon examination, Plaintiff judgment, insight, and attention were fair.  R. at 236, 234.  Dr. Cusi adjusted Plaintiff's medications to treat Plaintiff's anxiety.  R. at 235, 237, 232.  In January 2018, Plaintiff reported that her depressive symptoms were improving, though she was still experiencing some irritability.  R. at 227.

Plaintiff presented to the emergency room at the Hampton VA Medical Center on February 25, 2018, because she was experiencing palpitations, nausea and vomiting, as well as numbness and tingling near her eyes and in her fingers.  R. at 328.  She was diagnosed with a panic attack.

3

R. at 328.  Plaintiff reported that she was under stress recently as her husband was deployed and she was taking care of their children.  R. at 328.  Plaintiff was discharged the following day.  R. at 329.

In February 2018, Plaintiff sought mental health treatment at the Hampton VA Medical Center.  R. at 367.  There, her provider noted her past diagnoses of major depressive disorder, anxiety, and Bipolar II.  R. at 368.  Plaintiff reported her past medications have not been helpful. R. at 238.  Upon examination, Plaintiff's mood was tearful, anxious, and depressed, and her affect was congruent to her mood.  R. at 369.  She was oriented, pleasant, cooperative, and had adequate insight and judgment, and memory.  R. at 369.  Her provider noted she was being worked up for a post-traumatic stress disorder diagnosis.  R. at 369.  Plaintiff's medications were adjusted, and she was instructed to follow up in one month.  R. at 370.

As of July 2018, Plaintiff declined any worsening of her depression.  R. at 672.  Upon examination, she was cooperative and alert, her insight and judgment were not impaired, and her memory and cognition were intact.  R. at 674.  In December 2018, Plaintiff presented at the Hampton VA Medical Center walk-in patient at the Mental Health Connect clinic.  R. at 672. Plaintiff reported feeling anxious and depressed, but was unwilling to take medication to assist with her mood, and declined psychotherapy services.  R. at 672.

In February 2019, Plaintiff sought to establish care with Family Nurse Practitioner Christiana Herbert ("FNP Herbert") at the Hampton VA Medical Center.  R. at 658–64.  At that time, Plaintiff's migraines were stable with medication.  R. at 660.  In addition to her mental health concerns, Plaintiff also reported back and knee pain.  R. at 658–60.  She was taking Naproxen over the counter for her pain, and FNP Herbert ordered topical Voltaren.  R. at 660.  Upon examination, FNP Herbert noted tenderness to palpation over Plaintiff's bilateral lower thoracic and upper

4

lumbar paraspinal muscles. R. at 660. FNP Herbert ordered x-rays of Plaintiff's back that day, however, Plaintiff did not obtain the x-rays. R. at 583, 660.

Shortly thereafter, Plaintiff participated in a Caregiver Support Administrative Eligibility Screening for the Comprehensive Family Caregiver Program.[3] R. at 641. The Caregiver Support Coordinator found that Plaintiff did not meet the eligibility criteria for the program at that time. R. at 643. The Caregiver Support Coordinator encouraged Plaintiff to engage in PTSD treatment on a consistent basis, and medication management and individual therapy for six consecutive months and resubmit her application. R. at 643. Plaintiff reapplied for the program in September 2019. R. at 545–50, 565–66. Her application was again denied, and the staff psychiatrist noted that Plaintiff's "medication regimen is complicated and in need of simplifying, and she wishes to rely on medication to fix her problems, but we are attempting to simpl[if]y to 1-2 medications and continued empowerment and therapy are warranted." R. at 549–50.

Plaintiff reported worsening mood and emotional state to her psychiatrist with the Hampton VA Medical Center in April 2019, and requested a lithium prescription. R. at 620. Her provider noted that she missed her appointment the previous day, and requested she reschedule and talk about it at her next session. R. at 620.

Plaintiff was hospitalized for pneumonia from June 24, 2019, through June 26, 2019, as she was continuing to experience a dry cough and chest tightness. R. at 583. Upon follow-up with

---

[3] Plaintiff's records from the Hampton VA Medical Center note the Family Caregiver Program "is based upon Veteran's clinical need for support as indicated via clinical assessments, tests, and treatment plans" and the program is "rehabilitative and restorative in nature with the intent of supporting the Veteran's progress during treatment." R. at 641. Pursuant to the program:

> Qualifying Veterans must have a demonstrated need in their medical record and in the opinion of their treating team of personal services because of an inability to perform an activity of daily living, or due to the individual needing supervision or protection based on symptoms or residuals of neurological or other impairment or injury.

R. at 643.

her primary care provider, Physician Assistant Ginika Williams ("PA Williams"), Plaintiff recounted her history of chronic back pain in the thoracic and lumbar region. R. at 583. Plaintiff reported using Diclofenac gel as needed for her pain. R. at 583. Although Plaintiff denied a recommendation to get an x-ray in the past, she opted to receive a back x-ray while at the hospital. R. at 583. Her x-ray demonstrated minimal thoracic spondylosis, and specifically, minimal multilevel intervertebral disc space narrowing in the mid thoracic spine at T5-6, T6-7, and T7-8. R. at 277–78. Upon examination, Plaintiff denied any numbness or tingling. R. at 585. In July 2019, Plaintiff requested a different topical cream to help with her back pain as well as a back brace. R. at 568.

In October 2019, Plaintiff reported issues with whiplash after falling down the stairs. R. at 542. She reported a persistent negative attitude, tearfulness, irritability, and snapping at her children. R. at 542. Plaintiff reported concern that her medication had not been increased. R. at 542. In February 2020, Plaintiff reported the fall that occurred in October 2019 to PA Williams, and explained that she was having frequent headaches accompanied by nausea. R. at 518, 522. Plaintiff complained of numbness and tingling in her hands and headaches. R. at 514. At that visit, Plaintiff denied muscle pain or back pain. R. at 516. PA Williams noted that her symptoms appeared to be related to anxiety and she should contact her mental health provider to make sure her anxiety is controlled. R. at 517. Plaintiff rated her current pain level as a six out of ten, and that her "acceptable" pain level was a five out of ten. R. at 518. Plaintiff underwent a CT scan of her head, which was essentially normal, and negative for acute intracranial process. R. at 275. She presented to the emergency room later that month with nausea and vomiting from a migraine. R. at 485. Plaintiff was given Zofran, advised to rest and drink fluids, and discharged in stable condition. R. at 488–89.

### B. Relevant Medical Opinions

State agency examiners upon initial review and reconsideration determined there was insufficient evidence to determine the severity of Plaintiff's impairments due to limited mental status examinations during the relevant period. R. at 73–77, 81–83.

### C. Plaintiff's Testimony at ALJ Hearing

At the ALJ hearing, Plaintiff testified that she experiences social anxiety and that she does not like to be in crowd or socialize with people. R. at 44. She explained that her medication for anxiety makes her feel nauseous and drowsy, and that her anxiety causes her to experience insomnia. R. at 44, 48–50. She was hospitalized once for a panic attack while her husband was deployed. R. at 44. Plaintiff went off her medication for her anxiety during her pregnancy, and restarted once she had her youngest daughter. R. at 45. Plaintiff stated that her mental impairments hold her back more than her physical impairments. R. at 49. As for her ability to function, Plaintiff testified that her in-laws help her a lot around the house, especially while her husband is deployed. R. at 47, 49, 51. Her mother-in-law helps her cook and clean while her husband is gone because she just "shut[s] down." R. at 51.

## III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that

meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 404.1545(a). At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of April 13, 2017, through her date last insured, March 31, 2020. R. at 17. At step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, migraine, disorder of the back, and posttraumatic stress disorder. R. at 17. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 18–20. The ALJ specifically considered Listing 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), Listing 1.16 (lumbar spinal stenosis resulting in compromise of causal equina), and Listing 11.02 (documentation of generalized tonic-clonic seizures occurring at least once a month for at least three consecutive months despite adherence to prescribed treatment). R. at 18–19. The ALJ also noted that Plaintiff's mental impairments, considered singularly and in combination, did not meet or medically equal Listings 12.04, 12.06, and 12.15. R. at 19–20

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium exertional level work, with the following limitations:

> [Plaintiff] could have no more than occasional exposure to sustained, loud noises, or to bright lights. [Plaintiff] was limited to performing only simple, repetitive and routine tasks. She was limited to only nonproduction-paced tasks as to tempo and capacity. She was limited to maintaining a persistent effort on only routine tasks. She was limited to only rare interaction with the public but she was able to be in the presence of the public. [Plaintiff] was limited to only occasional interaction with co-workers and supervisors. The claimant was limited to tolerating only occasional changes in tasks or work settings.

R. at 20.

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR § 404.1529 and SSR 16-3p." R. at 20.

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a security technician and an ordinance helper, which are both considered medium, semi-skilled jobs. R. at 25. While Plaintiff cannot resume her prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy, including the representative occupations of janitor, hand packager, and

order picker. R. at 26.   Thus, the ALJ determined that Plaintiff was not disabled from the alleged

onset date, April 13, 2017, through the date last insured, March 31, 2020. R. at 26.

## IV. <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is

limited to determining whether the decision was supported by substantial evidence in the record

and whether the correct legal standard was applied in evaluating the evidence.  *See* 42 U.S.C.

§ 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   Substantial evidence is

"'evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craig v.*

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401

(1971)).   "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a

preponderance.'"  *Britt v. Saul*, No. 860 Fed. Appx. 256, 260 (4th Cir. 2021) (quoting *Craig*, 76

F.3d at 589).   The Court looks for an "accurate and logical bridge" between the evidence and the

ALJ's conclusions.  *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826

F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence,

the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute

our judgment for that of the [Commissioner]."  *Craig*, 76 F.3d at 589.   If "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the

decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)."  *Id.* (quoting

*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).   Accordingly, if the Commissioner's denial

of benefits is supported by substantial evidence and applies the correct legal standard, the Court

must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises four challenges to the ALJ's decision. First, Plaintiff argues that the ALJ erred by not finding that Plaintiff's impairments meet or equal a Listing applicable to the Musculoskeletal System at step three of the sequential evaluation process.[4] ECF No. 21 at 16–20. Second, Plaintiff argues that the ALJ erred in evaluating her RFC by improperly evaluating medical evidence from Plaintiff's treating providers. *Id.* at 21–27. Third, Plaintiff argues that the ALJ failed to perform a function-by-function analysis as required by *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). *Id.* at 27–31. Fourth, Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective complaints. *Id.* at 31–36. For the reasons explained below, the ALJ did not err in his decision.

### A. The ALJ Did Not Err at Step Three By Finding Plaintiff Did Not Meet Listing 1.15.

Plaintiff argues that the ALJ erred at step three of the sequential evaluation by finding that Plaintiff did not meet or equal the criteria of a Musculoskeletal System Listing.[5] ECF No. 21 at 16–20. In response, the Commissioner argues that the ALJ properly determined that Plaintiff's impairments did not meet or medically equal a Listing. ECF No. 23 at 11. The Commissioner contends that Plaintiff has not met her burden to demonstrate she meets *all* of the criteria required by Listing 1.15. *Id.* at 12.

At step three, the ALJ must determine whether the claimant's impairment meets or medically equals the severity of any disorder in the listings. § 404.1520(a)(4)(iii). "The 'listings'

---

[4] Plaintiff repeatedly references Listing 1.04(A). ECF No. 21 at 17–18. However, effective April 2, 2021, former Listing 1.04(A) was revised as Listing 1.15. *See* 85 Fed. Reg. 78164-01, 2020 WL 7056412 (Dec. 3, 2020). Because the ALJ's decision was made on August 10, 2021, the ALJ appropriately applied Listing 1.15. *Id.* ("we will use these final rules on and after their effective date in any case in which we make a determination or decision."). Listing 1.15 requires additional criteria be met in order for an individual to meet the listing, as compared to former Listing 1.04(A). *Id.*

[5] *See* n. 4, *supra.*

is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" *Bennett v. Sullivan*, 917 F.2d 157, 160 (4th Cir. 1990) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). The purpose of the listings is to describe certain impairments that are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 404.1525(a).

A claimant will meet a listing if his or her impairment "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.*; § 404.1525(c)(3). A claimant will medically equal a listing if the impairment "is at least equal in severity and duration to the criteria of any listed impairment." *Id.*; § 404.1526(a). "When a claimant satisfies a listing by meeting all its specified medical criteria, he presumably qualifies for benefits." *Bennett*, 917 F.2d at 160. It is the Plaintiff's burden of production and proof that he or she meets or equals a listing. *See Pickett v. Astrue*, 895 F. Supp. 2d 720, 723 (E.D. Va. 2012) ("[t]hrough the fourth step, the burden of production and proof is on the claimant.") (citing *Hunter v. Sullivan*, 993 F.2d at 31, 35 (4th Cir. 1993)).

Listing 1.15 requires an individual demonstrate *all* of the following criteria either simultaneously or within a close proximity of time:

> **1.15 *Disorders of the skeletal spine resulting in compromise of a nerve root(s)***, documented by A, B, C, *and* D:
>
> **A.** Neuro-anatomic (radicular) distribution of one or more of the following *symptoms* consistent with compromise of the affected nerve root(s):
>
> > 1. Pain; or
> >
> > 2. Paresthesia; or
> >
> > 3. Muscle fatigue.
>
> AND

**B.** Radicular distribution of neurological *signs* present during physical examination or on a diagnostic test and evidenced by 1, 2, and either 3 or 4:

>1. Muscle weakness; and

>2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root

>3. Sensory changes evidenced by:
>>a. Decreased sensation; or
>>b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; *or*

>4. Decreased deep tendon reflexes.

AND

**C.** Findings on imaging consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.

AND

**D.** Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least *one* of the following:

>1. A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or

>2. An inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, *and* a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or

>3. An inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

20 C.F.R. Part 404, Subpart P, App. 1., Listing 1.15 (internal references omitted). Additionally,

the listings now provide that "all of the required criteria must be present simultaneously, or within

a close proximity of time, to satisfy the level of severity needed to meet the listing." 20 C.F.R. Part 404, Subpart P, App. 1., Section 1.00C7c. Further, "the phrase 'within a close proximity of time' means that all of the relevant criteria must appear in the medical record within a consecutive 4-month period." *Id.* If the medical record demonstrates each listing criteria, "the medical record must also show that this level of severity has continued, or is expected to continue, for a continuous period of at least 12 months." *Id.*

Here, at step three, the ALJ considered Listing 1.15—the applicable listing—and found that it was not met. R. at 18. In support of this conclusion, the ALJ explained,

> [r]ecords note complaints of back pain without evidence of radiculopathy or signs of nerve root irritation. X-rays of her lumbar were normal while x-rays of the thoracic spine showed mild spondylosis at T5-6, T6-7, and T7-8. Further, exam findings only note tenderness to palpation along the paraspinal muscles and do not show the claimant has any gait disorders.

R. at 18.

While Plaintiff points to evidence regarding Plaintiff's complaints of back pain, tingling, and mild x-ray findings, Plaintiff's medical record falls woefully short of meeting Listing 1.15.[6] Even accepting Plaintiff's unpersuasive argument that she meets all other listing criteria,[7] Plaintiff has presented no evidence, nor is there any in the record, that she meets the criteria set forth in paragraph D of Listing 1.15. Specifically, Plaintiff has not demonstrated any "[i]mpairment-related physical limitation of musculoskeletal functioning" accompanied by a documented need for a walker or other bilateral assistive device, an inability to use her upper extremity and the need

---

[6] Notably, at the ALJ hearing, Plaintiff's attorney specifically conceded that Plaintiff had not met a Listing for her physical impairments. R. at 35 ("I agree that a listing for the physical is not met").

[7] Plaintiff's symptoms of "numbness and tingling" were only documented on two occasions. R. at 328, 514. The first, on February 25, 2018, Plaintiff's fingertip numbness and tingling was attributed to a panic attack when she presented to the emergency room. R. at 328. The second, on February 5, 2020, Plaintiff was complaining of increased headaches, migraines, and anxiety. R. at 514. No evidence from either medical record indicates Plaintiff's symptoms of numbness and tingling were accompanied by complaints or concerns about Plaintiff's back pain or condition. R. at 328.

14

for a one-handed assistive device, or the inability to use both upper extremities, as required by paragraph D of Listing 1.15. 20 C.F.R. Part 404, Subpart P, App. 1., Listing 1. Plaintiff's argument, largely citing Listing 1.04(A)—which is not applicable in this case—does not address the proper criteria to meet Listing 1.15. Nor does the evidence in Plaintiff's medical record support that she meets the criteria set forth in paragraph D of Listing 1.15. Plaintiff has not met her burden of demonstrating she meets Listing 1.15, and the ALJ did not err in finding the same.

**B. The ALJ Sufficiently Considered Records from Plaintiff's Treating Providers.**

Plaintiff argues that the ALJ failed to sufficiently analyze Plaintiff's medical records from two treating providers. ECF No. 21 at 21–27. Plaintiff argues that pursuant to the treating physician rule, the ALJ erred by failing to assign weight, controlling or otherwise, to medical opinions of the treating sources. *Id.* at 26. Plaintiff contends that the ALJ's failure to consider certain evidence renders her RFC without substantial evidence. *Id.* In response, the Commissioner argues that Plaintiff improperly refers to an outdated treating physician rule, and improperly characterizes Plaintiff's treatment notes as medical opinions. ECF No. 23 at 17–20. The Commissioner contends that because the record contains no medical opinions, the ALJ was not required to find any particular records persuasive, and the ALJ properly engaged in a robust review of the evidence in the record. *Id.* at 20.

First, the Court notes that Plaintiff's insistence that the treating physician rule remains in effect—and applies in this case—is patently mistaken. *See* ECF No. 21 at 21–22 (citing § 404.1527(b)); ECF No. 24 at 2–4 (citing *Dowling v. Comm'r Seoc. Sec. Admin.*, 986 F.3d 377, 384 (4th Cir. 2021) for the proposition that the treating physician rule supports reversal in this case). It is well established and accepted that the "treating physician rule" has been replaced, and does not apply to claims filed on or after March 27, 2017. § 404.1527 ("For claims filed before March

27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in §

404.1520c apply"); *Dowling v. Comm'r of SSA*, 986 F.3d 377, 384 n.8 (4th Cir. 2021) ("20 C.F.R.

§ 404.1527 has been replaced by 20 C.F.R. § 404.1520c as the regulation that governs the

evaluation of medical opinion evidence in Social Security cases."). In fact, in *Dowling*—which

Plaintiff relies on to insist that the treating physician rule is not outdated (*see* ECF No. 24 at 2)—

the Fourth Circuit specifically acknowledged that the treating physician rule only applied in that

case because the plaintiff's claims were filed before the regulation was changed. *Dowling*, 986

F.3d at 384 n.8 ("Section 404.1527 still applies to all Social Security claims filed before March

27, 2017, and, thus, remains the applicable regulation in this case."); *see also Erica L. E. v. Comm'r

of Soc. Sec.*, No. 2:20-CV-514, 2021 WL 6284166, at *6 n.2 (E.D. Va. Dec. 20, 2021) ("For claims

filed after March 27, 2017, the regulations instruct ALJs to no longer 'defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion.' §§ 404.1520c(a),

416.920c(a)."). Because Plaintiff filed her claim for DIB on November 24, 2020 (R. at 73), the

treating physician rule does not apply, and instead, the ALJ would be required to evaluate medical

opinions in the record pursuant to Section 404.1520c.[8]

    Second, Plaintiff mistakenly conflates treatment records with medical opinions. ECF No.

21 at 22–27. Applicable to Plaintiff's case[9], "[a] medical opinion is a statement from a medical

---

[8] Notably, in at least one other case involving Plaintiff's counsel, the Court's report and recommendation explicitly informed Plaintiff's counsel that the treating physician rule is outdated and does not apply to claims filed after March 27, 2017. *Eric E. v. Comm'r of Soc. Sec.*, No. 2:21-cv-398, 2022 WL 1574221, at *14 (E.D. Va. Mar. 11, 2022). In her opposition brief here, the Commissioner thoroughly discussed the history, evolution and ultimate abandonment of the treating physician rule, resulting in its inapplicability here, and provided extensive citations to the Federal Register and the Code of Federal Regulations in explanation thereof. ECF No. 23 at 17–19. It is perplexing to the Court why Plaintiff's counsel continues to advocate that the treating physician rule applies to claims filed after March 27, 2017, especially after being informed by this Court and the Commissioner that she is mistaken.

[9] Even relying on the old regulations, the records Plaintiff cites would not be considered medical opinions. *See* § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the Plaintiff's] impairment(s), including [the Plaintiff's]

source about what [the Plaintiff] can still do despite [his or her] impairment(s) and whether [the Plaintiff] ha[s] one or more impairment-related limitations or restrictions" in his or her abilities to: perform physical demands of work activities, perform mental demands of work activities, perform other demands of work, and ability to adapt to environmental conditions. § 404.1513. There are no such medical opinions—from treating providers or otherwise—in Plaintiff's medical record. Accordingly, the ALJ could not, and did not, err in considering any medical opinions.

To the extent Plaintiff argues that the ALJ failed to consider certain evidence from Tricare and the Hampton VA Medical Center in crafting Plaintiff's RFC, that argument is also without merit. ECF No. 21 at 24. Plaintiff points to the following evidence to support her claim that the ALJ failed to fully analyze records from Plaintiff's treating providers: Plaintiff's diagnoses of depression, anxiety, obsessive compulsive disorder, bipolar disorder, PTSD , and back pain (citing R. at 238–41, 644–57, 276); Plaintiff's unmanaged anxiety and irritability (citing R. at 234, 236); records indicating Plaintiff experienced numbness in her fingertips, a headache or migraines, and vomiting (citing R. at 328, 515–27); a physical exam that demonstrated tenderness to palpation over bilateral upper lumbar paraspinal lower thoracic muscles (citing R. at 644–57); an x-ray of Plaintiff's lumbar spine indicating some disc space narrowing (citing R. at 277–78); a visit to the emergency room because of a migraine which resulted in vomiting (citing R. at 545–97). ECF No. 21 at 22–24.

However, in reviewing the ALJ's decision, he cited and considered almost every record identified by Plaintiff. As just a few examples, The ALJ noted that Plaintiff experienced obsessive compulsive symptoms, mood swings, sadness, irritability, anger, anxiety, panic attacks, and

---

symptoms, diagnosis and prognosis, what [the Plaintiff] can still do despite impairment(s), and [the Plaintiff's] physical or mental restrictions.").

received diagnoses of obsessive-compulsive disorder and bipolar disorder. R. at 22 (citing R. at 238, 240, 241). The ALJ recognized that in October 2017, Plaintiff's mood was stable, but her anxiety was still bothering her. R. at 22 (citing R. at 236). The ALJ noted that Plaintiff was seen in the emergency room for panic attacks and experiencing fingertip numbness and periorbital headache. R. at 22 (citing R. at 328). Additionally, the ALJ recognized Plaintiff's complaints about back pain, her x-ray results showing minimal disc space narrowing, and her back tenderness upon examination. R. at 23 (citing R. at 658, 277, 660). Thus, the ALJ considered the treatment records that Plaintiff alleges were crucial to the ALJ's RFC analysis.

In sum, the ALJ was not required to give any particular weight to any treatment records. The ALJ sufficiently considered medical records from Plaintiff's treating providers in his RFC analysis, and did not err on this ground.

### C. The ALJ Did Not Err by Failing to Perform a Function-by-Function Analysis.

Plaintiff's third argument alleges that the ALJ erred by failing to perform a function-by-function analysis as required by *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). ECF No. 21 at 27–31. Specifically, Plaintiff argues that the ALJ did not discuss whether Plaintiff could perform the relevant functions for a full workday, that substantial evidence does not support the ALJ's conclusion that Plaintiff could perform medium level exertional work, and that the ALJ did not sufficiently credit Plaintiff's complaints regarding her symptoms. *Id.* at 29–31. In response, the Commissioner argues that *Mascio*'s requirement that the ALJ perform function-by-function analysis does not warrant remand in this case. ECF No. 23 at 21–22. The Commissioner argues that the ALJ appropriately gave a narrative discussion of the evidence that supports the ALJ's RFC determination and fully accounted for Plaintiff's functional limitations stemming from her mental and physical impairments. *Id.*

18

After step three of the sequential analysis, the ALJ must determine the claimant's RFC. § 404.1520(a)(4). RFC is defined as "the most" a claimant "can still do despite [his or her] limitations." § 404.1545(a)(1). In making the RFC determination, the ALJ must consider "all the relevant medical and other evidence" in the record and incorporate any impairments supported by objective medical evidence, and those impairments based on the claimant's credible complaints. § 404.1545(a)(3); *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (citing SSR 96–8p, 1996 WL 374184 (July 2, 1996)).

In determining the claimant's RFC, the ALJ must "identify the individual's functional limitations" and then assess the individuals "work-related abilities on a function-by-function basis." *Mascio*, 780 F.3d at 636. Those functions include: (1) the claimant's ability to perform "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)"; (2) the claimant's ability to perform "mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting"; and (3) other work related abilities that may be affected by impairments that could impose environmental restrictions. *Id.* at 636 n.5; § 404.1545(b)–(d). The ALJ must include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

While there is no per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis, "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.* (citing *Cichocki*

*v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2019) (per curiam)). "Meaningful review is frustrated—and remand necessary—only where 'we are unable to fathom the [] rationale in relation to evidence in the record.'" *Britt v. Saul*, 860 F. App'x 256, 262 (4th Cir. 2021) (quoting *Cichocki*, 729 F.3d at 177). Additionally, if the ALJ does not conduct an explicit function-by-function analysis, "'the court must assess whether the ALJ's RFC analysis considered the relevant functions, whether his decision provides a sufficient basis to review his conclusions, and, ultimately, whether that decision is supported by substantial evidence in the record.'" *Eric E. v. Comm'r of Soc. Sec.*, No. 2:21-cv-398, 2022 WL 1574221, at *16 (E.D. Va. Mar. 11, 2022) (citing *Ashby v. Colvin*, No. 2:14-674, 2015 WL 1481625, at *3 (S.D. W. Va. Mar. 31, 2015)), *report and recommendation adopted*, 2022 WL 4137835 (E.D. Va. Sept. 12, 2022).

Here, the ALJ sufficiently explained how he considered the medical evidence and determined Plaintiff's functional limitations in Plaintiff's RFC assessment. While the ALJ did not perform an explicit function-by-function analysis, the ALJ considered the relevant functions and cited sufficient evidence in the record to support his RFC determination as to those functions.

Regarding Plaintiff's physical abilities, the ALJ sufficiently discussed Plaintiff's ability to perform physical activities on a regular and continuing basis, including "work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions." § 404.1545(b). In recounting the medical evidence, the ALJ noted Plaintiff's testimony that she has back pain and knee pain, but her mental impairments bother her more. R. at 21. The ALJ recognized that her medical records noted back and knee pain, and on one occasion, she had tenderness to palpation over the bilateral lower thoracic and upper lumbar paraspinal muscles. R. at 23 (citing R. at 658, 660). The ALJ noted Plaintiff's reports of chronic back pain, however, her x-rays demonstrated minimal disc space narrowing and a prescription for lidocaine cream at her

request. R. at 23 (citing R. at 583, 277–78, 568). In explaining his RFC determination, the ALJ noted inconsistencies between Plaintiff's conservative course of treatment and recorded physical symptoms do not fully support Plaintiff's allegations of disabling impairments. R. at 24. The ALJ explained that "[t]reatment records note [Plaintiff's] physical exam findings are generally normal with only one mention of tenderness to her spine. Imaging records show a normal lumbar spine and only minimal changes in the thoracic spine." R. at 24. Thus, because Plaintiff had limited treatment and complaints about her back, the ALJ concluded that Plaintiff could perform medium work, but no other functional limitations were required. § 404.1545(b).

As for Plaintiff's mental abilities, the ALJ sufficiently discussed Plaintiff's ability to perform "mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." The ALJ exhaustively detailed Plaintiff's treatment records demonstrating Plaintiff's difficulty treating her anxiety and related symptoms of panic attacks, depression, irritability, and insomnia. R. at 22–23 (citing R. at 236, 328, 672, 368). The ALJ recounted that Plaintiff's panic attacks have been accompanied by fingertip numbness and tingling. R. at 22 (citing R. at 328). The ALJ further detailed Plaintiff's migraine episodes, and that she experienced some tingling in her hands when confronted with a migraine, as well as hospitalization from nausea and vomiting related to a migraine. R. at 22–24 (citing R. at 660, 514, 489). The ALJ also recognized Plaintiff's testimony that she lashes out a lot, needs assistance caring for her children, and does not like to be around or socialize with others. R. at 21, 23 (citing R. at 547). However, the ALJ also detailed medical records that Plaintiff demonstrated intact memory and insight, and her judgment and attention were within normal limits. R. at 22 (citing R. at 239, 231–32, 238, 374). The ALJ also noted that Plaintiff's migraines were stable with medication. R. at 23 (citing

R. at 660). Additionally, Plaintiff was independent with personal care, grooming, bathing, and driving, and could manage her appointments and medications, albeit with reminders. R. at 23 (citing R. at 547).

In explaining his RFC determination, the ALJ noted that Plaintiff's conservative course of treatment and medications and recorded mental signs and symptoms do not fully support Plaintiff's allegation of disabling impairments. R. at 24. The ALJ explained that Plaintiff's migraines were stable, her mental health records indicated improvement and stability in mood and affect with medication, and Plaintiff had normal mental status examinations, which is consistent with her testimony that she is able to perform her activities of daily living and care for her children. R. at 24. The ALJ crafted Plaintiff's RFC and included restrictions including that Plaintiff was limited to performing only simple, repetitive and routine tasks; limited to only nonproduction-paced tasks as to tempo and capacity; limited to maintaining a persistent effort on only routine tasks; limited to only rare interaction with the public but could be in the presence of the public; limited to occasional interaction with co-workers and supervisors; and limited to tolerating only occasional changes in a work setting. R. at 20. Thus, the ALJ adequately discussed Plaintiff's ability to perform "mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." § 404.1545(c).

Finally, the ALJ noted "other abilities affected by [Plaintiff's] impairments" related to vision or other senses, that impose environmental restrictions that affect Plaintiff's work-related abilities. § 404.1545(c). As explained above, the ALJ sufficiently recounted Plaintiff's history and course of treatment related to her migraines. R. at 22–24 (citing R. at 660, 514, 489). The ALJ's RFC determination included the environmental limitations that Plaintiff could have no more

than occasional exposure to sustained, loud noises, or to bright lights. R. at 20. Such RFC limitation explains Plaintiff's ability to perform work-related functions in light of her environmental restrictions caused by her migraines. § 404.1545(c).

Thus, although the ALJ did not perform an explicit function-by-function analysis, the ALJ engaged in a robust review of the record and discussed how the evidence affected Plaintiff's physical, mental, and other abilities to perform work related functions. Pursuant to *Mascio*, the ALJ did not fail to assess Plaintiff's ability to perform relevant functions, and the ALJ's decision allows meaningful review. *Mascio*, 780 F.3d at 66. The ALJ "buil[t] an accurate and logical bridge from the evidence to [the ALJ's] decision" that allows this Court to evaluate the ALJ's decision. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Accordingly, remand is not warranted on this ground.

### D. The ALJ Did Not Err in Evaluating Plaintiff's Subjective Complaints Regarding Her Symptoms.

Finally, Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective complaints. ECF No. 21 at 31–36. Specifically, Plaintiff contends that the ALJ cherry-picked facts regarding Plaintiff's testimony about her mental health symptoms, and that Plaintiff's subjective complaints regarding her mental health symptoms were consistent with the objective medical evidence. *Id.* In response, the Commissioner argues that the ALJ accurately summarized Plaintiff's statements about her symptoms and limitations, and provided sufficient reasons why Plaintiff's subjective statements were not entirely consistent with the evidence in the record. ECF No. 23 at 22–25.

To evaluate a claimant's subjective complaints in the context of an RFC determination, the ALJ must conduct a two-step analysis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); § 404.1529(a). At step one, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to

produce the claimant's alleged symptoms." *Id.* (citing § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). At step two, the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and perform basic work activities. *Id.* (citing § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4). To evaluate the individual's symptoms, the ALJ looks to whether Plaintiff's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Craig*, 76 F.3d at 595. However, the ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029 at *5) (internal quotation omitted); *Walker v. Bowen*, 889 F.2d 49, 49 (4th Cir. 1989) ("there need not be objective evidence of the pain itself or the intensity."). Because symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques, at step two, the ALJ must consider the entire case record to assess the limiting effects of the individual's symptoms. *Arakas*, 983 F.3d at 95.

Here, at step one of the analysis, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. R. at 21. At step two of the analysis, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. at 21. The ALJ summarizing Plaintiff's testimony, including her allegations that she experiences panic attacks, anxiety, social anxiety, and difficulty being in crowds, and that she does not like to be around others or socialize. R. at 21. The ALJ recognized Plaintiff's testimony that she gets help from her in-laws, lashes out a lot, but is able to drive, cook, and clean. R. at 21. The ALJ also found that Plaintiff had a moderate limitation in

understand, remembering and applying information; a marked limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. R. at 20.

After engaging in a thorough review of the medical evidence in the record, the ALJ concluded that "the evidence of record does not support the alleged loss of functioning" and that Plaintiff's allegations of disabling impairments "are inconsistent with objective findings and subjective findings on examinations as well as her activities of daily living." R. at 24. The ALJ further noted that Plaintiff's "conservative course of treatment and medications and recorded physical and mental signs and symptoms do not fully support [Plaintiff's] allegations." R. at 24. The ALJ continued to note that as for Plaintiff's allegations regarding her physical impairments, "[t]reatment records note her physical exam findings are generally normal with only one mention of tenderness to her spine," Plaintiff's [i]maging records show a normal lumbar spine and only minimal changes in the thoracic spine," and Plaintiff's migraines are stable. R. at 24. As for her mental impairments, the ALJ notes that her mood and affect were improved and stable with medication, and Plaintiff's mental status exam findings were normal. R. at 24. The ALJ concluded that Plaintiff's mental health records were consistent with her testimony that she was able to perform activities of daily living and care for her children while her husband was deployed. R. at 24.

Moreover, the ALJ accounted for many of Plaintiff's subjective complaints in his RFC determination.  For example, the ALJ recognized that Plaintiff had a marked limitation in interacting with others, and credited her testimony that she does not like to socialize or be in crowds due to panic attacks, social anxiety, and PTSD, and credited her testimony regarding her outbursts, anger and irritability. R. at 19.  In his RFC determination, the ALJ limited Plaintiff to rare

interaction with the public, and only occasional interaction with co-workers and supervisors. Similarly, the ALJ found Plaintiff had a moderate limitation in understanding, remembering, or applying information, as well as a moderate limitation in concentrating, persisting, or maintaining pace. R. at 19–20. The ALJ credited Plaintiff's testimony that she needs assistance with daily activities, including caring for her home, needs reminders to complete activities. R. at 19. The ALJ included RFC limitations that Plaintiff can perform only simple, repetitive, and routine tasks; only nonproduction-paced tasks as to tempo and capacity; and maintaining a persistent effort on only routine tasks. R. at 20.

Accordingly, consistent with *Arakas*, the ALJ did not rely on objective medical evidence alone in determining Plaintiff's intensity, persistence, and limiting effects of Plaintiff's subjective complaints were not entirely consistent with the record. The ALJ considered the entirety of the record—including Plaintiff's subjective complaints and the medical evidence—and made determinations about how Plaintiff's subjective complaints affect Plaintiff's ability to work. The ALJ credited many of Plaintiff's subjective complaints and incorporated appropriate restrictions into her RFC determination. Thus, ALJ did not err in evaluating Plaintiff's subjective complaints.

## VI. <u>RECOMMENDATION</u>

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 20, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 22, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. <u>REVIEW PROCEDURE</u>

By receiving a copy of this Report and Recommendation, the parties are notified that:

26

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
January 5, 2023

27